PHIL POLDRUGOVAZ and MADELINE POLDRUGOVAZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
POLDRUGOVAZ v. COMMISSIONER
Docket No. 25913-81.
United States Tax Court
T.C. Memo 1984-15; 1984 Tax Ct. Memo LEXIS 655; 47 T.C.M. (CCH) 860; January 10, 1984. Chester Kosarek and James V. Tamburro, for the petitioners. Richard J. Sapinski, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency of $6,332 in petitioners' 1979 Federal income taxes. By an amended answer, respondent asserted that petitioners are liable for an addition to tax pursuant to section 6653(a)[1] in the amount of $316.60. After concessions by the parties, the issues remaining for decision are as follows: (1) Whether petitioners are entitled to a charitable contribution deduction of $3,500 under section 170 for amounts transferred by them to the Freedom Church of Revelation in 1979; (2) whether petitioners are entitled to charitable contribution *658 deductions totaling $14,700 for transfers of property allegedly made by them to an "entity" described as local congregation No. 00293; (3) whether petitioners are entitled to deductions for certain expenses allegedly related to rental property owned by them; (4) whether petitioners are entitled to itemized deductions for sales taxes allegedly paid by them, in excess of that allowed by respondent; (5) whether petitioners are entitled to claim as itemized deductions certain expenses allegedly related to petitioner, Phil Poldrugovaz's employment as a New York City firefighter; and (6) whether petitioners are liable for an addition to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. [2]
*659 Madeline (hereinafter "petitioner") and Phil Poldrugovaz (hereinafter "Mr. Poldrugovaz"), husband and wife, (hereinafter collectively referred to as "petitioners") resided at Brooklyn, New York, when the petition was filed in this case. Petitioners timely filed a 1979 joint Federal income tax return with the Internal Revenue Service Center at Holtsville, New York. For purposes of clarity, the findings and opinion will hereinafter be categorized by reference to the particular types of deductions claimed by petitioners on their 1979 return. I. Charitable Contribution Deductions
During 1979, petitioner was employed as a full charge bookkeeper, and Mr. Poldrugovaz was employed as a New York City fireman. Petitioners earned total joint wage income of $36,717.78 during 1979. At some undisclosed time in 1979, petitioners became involved with an organisation known as the Freedom Church of Revelation (hereinafter "FCR"). During 1979, petitioner and Mr. Poldrugovaz each received from FCR "certificates of ordination" which purported to render them "ministers" of FCR. These documents were, on their face, dated November 12, 1979, and purported to be signed by "Most Rev. Francis *660 John" (a/k/a/ Frank J. Conti), the "founder" of FCR. During 1979 the headquarters of FCR was located in Hohokus, New Jersey. [3]
*661 Following their receipt of "certificates of ordination," petitioners received another document labeled as a "charter" which purported to establish a local congregation of FCR at petitioners' residence at 93 Third Street, Brooklyn, New York (hereinafter the "Third Street address"). This "charter" also purported to be signed by "Rev. Francis John" and was dated November 12, 1979. According to the "charter," petitioners' local congregation was designated congregation No. 00293. (Hereinafter, petitioners' alleged local congregation will be referred to as local congregation No. 00293.) In order to become a "minister" of FCR, an individual must attend a meeting, make an application and be "accepted" prior to becoming "ordained." Additionally, a "donation" of 10 percent of the individual's prior year's gross income is normally required to be made to FCR at the time a person applies to become a "minister." On December 6, 1979, petitioners drew a check on their personal checking in the amount of $3,500 payable to FCR and delivered it to Mr. Joseph Borriello, a representative of FCR. Subsequently, petitioners received a "receipt" from the International Treasurer of FCR which reflected *662 that a cash "donation" (rather than a check) of $3,500 had been made by petitioners to FCR on November 15, 1979 (rather than December 6, 1979). This $3,500 "donation" represented approximately 10 percent of petitioners' annual gross income. Both prior to and after becoming an "ordained minister" of FCR, petitioner attended numerous seminars conducted by Freedom College, an organization operated by FCR. An enrollment reservation form for one Freedom College seminar described the topics to be discussed at the seminar as follows: O Issue Grants!
O Reduce Your Tax Obligation
O Estate Planning!
Approximately 70% to 100% This Year
O School Funding Tuition!
and Each Year Thereafter!
O Make Tax-Free Purchases!
O Make Money, Food and Property
O Congregational Investments
Donations to Needy Situations!
Without Capitol [sic] Gain!
O Congregational Investments for 100%
Within the Next 24 Months!
At least portion of petitioners' $3,500 payment to FCR was used to pay costs associated with Freedom College's conduct of its seminars. During 1979, petitioners made total charitable contributions of $100 to organizations not associated with FCR with the largest *663 single donation to those organizations amounting to $10. Petitioners' transfer of $3,500 to FCR was made in consideration for their "certificates of ordination" and "charter" as well as their right to attend seminars conducted by Freedom College. [4]
*664 Local congregations of FCR in general, and petitioners' local congregation No. 00293 in particular, were controlled and "managed" by the local congregation's board of trustees. The boards of trustees of the local congregations therefore exercise complete control over any expenditures made by local congregation of "donated" funds, and FCR does not generally concern itself with expenditures of funds by the local congregations. Thus, as applicable during the years in issue, the articles of association of FCR provided in pertinent part as follows: 6. The Local Churches. The local churches or congregations of the Church are chartered by the presiding Bishop who may revoke such charters for good cause shown. Each local church is headed by a minister, who is trustee and corporate sole thereof, and each local church shall be an autonomous religious body under the spiritual authority of the church. Each local church shall have sole control over its property real and personal, pursuant to the general oversight of the staff and these articles. * * * [Emphasis supplied.] A booklet published by FCR, setting forth its basic beliefs and organizational structure, provided in pertinent *665 part: THE ESTABLISHMENT AND FINANCIAL MAINTENANCE OF A LOCAL FAMILY CONGREGATION Freedom Church of Revelation charters local Family Congregations. Each local Congregation has one or more Ministers, licensed, commissioned and ordained by investiture (public oath) to manage each Congregation with a Board of Trustees. Each local Congregation is maintained by voluntary contributions. Ministers… as Trustees… pay all congregational expenses, except food and servants, according to Parsonage Allowance, 26 U.S.C. § 107.(See I.R.S. Publication 525) Since a Church consists of people, and since two or more people constitute a Congregation of a church, Ministers of local Congregations should support themselves by outside secular employment and donate up to 50% of their adjusted gross income to the local Congregations until such time as the local Congregation can expand to such an extent that the Minister can devote full time to the service of the Congregation. At some time late in 1979, petitioner, Mr. Poldrugovaz, and Mr. James Bamundo (petitioner's brother) were established as the board of trustees of petitioners' local congregation No. 00293. On December 31, 1979, the *666 board of trustees opened a checking account in the name of local congregation No. 00293. The authorized signatories on this account were petitioner, Mr. Poldrugovaz and Mr. Bamundo. Funds could be drawn on this account by any two authorized signatories. Subsequent to opening the checking account in the name of local congregation No. 00293, during 1980, petitioners drew numerous checks on their personal account and deposited them in the local congregation No. 00293 checking account. Additionally, petitioner deposited at least some of her paychecks from her employment as a bookkeeper into the local congregation No. 00293 checking account. In the year following 1979, petitioners drew numerous checks on the local congregation No. 00293 checking account, purportedly as "ministers" and "trustees" of local congregation and used these checks to pay various personal expenses including, inter alia, household expenses, education expenses of petitioner's children, theater tickets and medical expenses.
On their 1979 Federal income tax return, petitioners claimed a total charitable contribution deduction of $18,300.Of this amount, $18,200 represented alleged "donations" to FCR and local *667 congregation No. 00293. More precisely, petitioners claimed charitable deductions on their 1979 return for the $3,500 transferred by them to FCR on December 6, 1979. The remaining $14,700 claimed by petitioners allegedly represents non-cash property which was purportedly "donated" by petitioners to local congregation No. 00293. On February 8, 1979, prior to trial herein, respondent served on Mr. Poldrugovaz a subpoena duces tecum requesting, inter alia, petitioners to produce the following: 10. All records substantiating the claimed $18,200 in property donated to a charitable organization in 1979 as claimed on petitioners' 1979 Form 1040 including copies of all cancelled checks, receipts, bills of lading for property donated etc. Petitioners have not produced any documents which would tend to substantiate their transfer of any non-cash property to local congregation No. 00293 during 1977. It is clear, however, that certain property allegedly "donated" by petitioners to local congregation No. 00293 remained subject to petitioners' unrestricted use and control at all times during 1979. [5] Moreover, petitioners arrived at their valuation of the property allegedly donated *668 to local congregation No. 00293 on their own without benefit of an independent appraisal. II. Deductions Related to "Rental Property"
Petitioners' residence during 1979, the Third Street address, was a two-family house which was purchased by Mr. Poldrugovaz on or about March 6, 1973, for a purchase price of $10 plus a purchase money mortgage of $12,000 which was simultaneously given by Mr. Poldrugovaz to the sellers. During the first six months of 1979, the second floor of the Third Street address was occupied by a friend of Mr. Poldrugovaz, who paid petitioners a total of $900 as rent during the first six months of 1979. In June 1979, Mr. Poldrugovaz's friend vacated this premises without notice to petitioners and paid no further rent to petitioners during 1979. After Mr. Poldrugovaz's friend vacated the second floor of petitioners' residence, said second floor was not rented by petitioners to any third party during 1979 or thereafter. Rather, such portion of petitioners' *669 residence was occupied by petitioner's two children at no charge to them. On their 1979 Federal income tax return, petitioners reported the $900 they received as rental income from Mr. Poldrugovaz's friend during the first six months of 1979. Petitioners also claimed the following deductions allegedly generated by the operation of their "rental property:" Depreciation
[6] $607.50
Repairs and Misc. Expenses
582.60
Exterminators
129.60
Fuel
995.64
Misc.
131.87
Insurance
248.00
Total
$2,695.21
Thus, petitioners claimed a net loss of $1,795.21 from their "rental activities" in 1979. [7]
*670 Petitioners made the following payments in connection with the Third Street address during 1979: Payee
Amount Expended
Empire Rest (Exterminators)
$129.60
Brooklyn Union Gas
679.90
Con Edison
315.74
III.Miscellaneous Deductions and Deductions for Sales Tax
On their 1979 Federal income tax return, petitioners claimed as miscellaneous itemized deductions the following alleged expenses: Union Dues
$405.34
House Tax
250.00
Lost Meals
110.00
Uniforms & Tools
350.00
Uniform Maintenance
200.00
Detail Between Units
30.00
Books to Maintain Skills
50.00
Telephone
144.00
Tax Preparation
50.00
Publications WNYF
11.00
Total
$1,600.34
Respondent disallowed the above-claimed deductions in full in his statutory notice of deficiency for lack of substantitation. In addition to the above "miscellaneous deductions," petitioners claimed a deduction of $1,200 for sales tax on their 1979 Federal income tax return. In his statutory notice of deficiency, respondent disallowed the claimed sales tax deduction to the extent of any amount over $613. OPINION I.Charitable Contribution Deductions
Petitioners contend that the claimed *671 deductions for their payment to FCR ($3,500) and alleged transfers to congregation No. 00293 ($14,700), are allowable as charitable contributions under section 170. [8] Respondent admits that petitioners transferred $3,500 to FCR, but argues that this transfer did not constitute a deductible expenditure either because FCR, the transferee, was not a qualified organization under section 170(c)(2)(B), or because the transfer itself did not constitute a "charitable contribution." With respect to the $14,700 worth of property which petitioners allegedly transferred to local congregation No. 00293, respondent, in addition to asserting the above-mentioned contentions, argues that petitioners have failed to demonstrate that any transfer whatsoever occurred in 1979. Petitioners have the burden of proving their entitlement to deductions they claim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In order to sustain their burden of proving that they are entitled to deductions under section 170, petitioners *672 must establish: (1) That they made a "contribution;" (2) the amount of the alleged contribution; and (3) that the contribution was made to a qualified charitable organization. See sections 501(c)(3), 262 and 170(c)(2); section 1.170A-1(a)(2), Income Tax Regs.; McGahen v. Commissioner,76 T.C. 468 (1981), affd. by unpublished order (3d Cir. Aug. 25, 1983). Petitioners have failed to establish that they are entitled to any portion of the claimed charitable deductions at issue herein. Initially, although it is clear that petitioners actually transferred $3,500 to FCR in 1979, petitioners have not established that this transfer constituted a charitable contribution. The term "charitable contribution" as it is used in section 170 is largely synonymous with the term "gift." Davis v. Commissioner,81 T.C. 806 (1983); See v. Commissioner,57 T.C. 265, 275 (1971); De Jong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373, 376-379 (9th Cir. 1962). A gift is generally defined *673 as a voluntary transfer of property to another without consideration. Davis v. Commissioner,supra;Seed v. Commissioner,supra at 275; De Jong v. Commissioner,36 T.C. at 899. "If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." De Jong v. Commissioner,36 T.C. at 899. See also Sutton v. Commissioner,57 T.C. 239, 242-243 (1971). Determining a taxpayer's incentive in making a transfer involves a factual inquiry which seeks to expose the true nature of a transaction. The question is essentially whether charitable benevolence prompted the transfer or whether, on the other hand, the transfer was made "in expectation of the receipt of certain specific direct economic benefits within the power of the recipient to bestow directly or indirectly, which otherwise might not be forthcoming." Stubbs v. United States,428 F.2d 885, 887 (9th Cir. 1970), cert. denied 400 U.S. 1009 (1971). *674 Applying the above principles, petitioners have failed to show that the $3,500 they transferred to FCR qualified as a "charitable contribution." To the contrary, we think it clear that petitioners' tranfer was made principally in expectation of the receipt of specific economic benefits which would not otherwise have been available to them. More precisely, petitioners' own witness testified that FCR generally required a prospective minister to "donate" 10 percent of his prior year's gross income at the time the individual applied to become a minister. In return for such transfer, the applicant became an "ordained minister," secured a "charter" for a "local congregation" and was entitled to attend seminars which instructed the individual on purported methods of using his newly acquired status as an "ordained minister" to, inter alia, "reduce [his] tax obligation approximately 70% to 100% this year and each year thereafter." Petitioner had read the FCR literature which described the various tax benefits that purportedly could be utilized by a "minister," prior to becoming involved with that organization. In light of this evidence, and in view of the additional fact that petitioners *675 made no other single contribution in excess of $10 to any other charitable organization during 1979, we have found that petitioners' transfer of $3,500 to FCR was payment of a mandatory "ordination," "charter" and "education" fee and was inspired principally by anticipated economic benefit that would not, absent the transfer, have been forthcoming. As such, the transfer was a quid pro quo and may not be claimed by petitioners as a charitable contribution deduction. [9] We will accordingly sustain respondent's disallowance of this portion of petitioners' claimed deduction. We now turn to the non-cash property allegedly transferred by petitioners to local congregation No. 00293 for which petitioners claimed a charitable contribution deduction of $14,700. With respect to these alleged contributions, it is petitioners' apparent position that local congregations of FCR are integral and inseparable *676 parts of the parent FCR. Moreover, petitioners apparently maintain that the parent FCR qualified as a valid section 501(c)(3) organization during the years in issue and that respondent erroneously revoked its exempt status on September 30, 1982, effective for all years beginning after December 31, 1978. Petitioners would terefore have us find that the parent FCR's alleged tax exempt status extended to local congregation No. 00293, and that the purported contributions of property by petitioners to local congregation No. 00293 therefore qualified as charitable contributions under section 170(c)(2). We cannot agree with petitioners' conclusion that the parent FCR's Federal tax status is in any way determinative of the Federal tax status of the local congregations, because it is clear from this record that the local congregations were separate and distinct from the perent FCR.Although petitioners' witness testified in general terms that FCR and its local congregations were "one church," he also specifically testified that local congregations of FCR, or, more precisely, the "boards of trustees" of such local congregations, exercise complete control over expenditures of funds transferred *677 to the local congregations. Moreover, although petitioners' witness testified that the "international treasurer" of FCR was empowered to "call in any financial statements of any congregation at any time for verification" there is no indication in this record that such authority was ever exercised or, if exercised, that any acutal limits were ever placed upon the local congregations by FCR with respect to expenditures of their funds. Such authority, if it existed at all, was therefore largely illusory. Finally, the articles of association of FCR specifically state that the local congregations of FCR "shall be… autonomous religious bodies" and that "[e]ach local church shall have sole control over its property real and personal…" On these facts it is clear that the local congregations of FCR were legally distinct from the parent FCR. Cf. Basic Bible Church v. Commissioner,74 T.C. 846, 856 (1980). Petitioners must therefore prove that local congregation No. 00293 independently qualified under section 170(c)(2) in order for alleged contributions to that entity to qualify as charitable contributions under section 170, and evidence of the parent FCR's alleged *678 exempt status is immaterial to a determination of the local congregation's qualification. [10]Basic Bible Church v. Commissioner,supra at 856. One of the requirements for an organization's qualification under section 170(c)(2) is that no part, however small, of the net earnings of the organization inure to the benefit of any private shareholder or individual. Section 170(c)(2)(C); Miedaner v. Commissioner,81 T.C. 272 (1983); McGahen v. Commissioner,supra,76 T.C. at 482; Unitary Mission Church of Long Island v. Commissioner,74 T.C. 507, 513 (1980), affd. 647 F.2d 163 (2d Cir. 1981). In this case it is clear that the net earnings *679 of local congregation No. 00293 inured to petitioners' private benefit. The record clearly establishes petitioners' pervasive use of the local congregation No. 00293 checking account to pay personal and family expenses and, conversely, the record is devoid of any evidence that would establish that any portion of the property transferred to local congregation No. 00293 was used for public purposes. Moreover, the record shows that petitioners continued to hold property which formed the basis of their alleged contribution local Congregation No. 00293 for their personal use and benefit after the alleged tranfer. Under these circumstances we have no difficulty in concluding that local congregation No. 00293 violated the private inurement prohibition of section 170(c)(2)(C) and therefore failed to qualify under section 170(c)(2). See Davis v. Commissioner,supra;Church of the Transfiguring Spirit, Inc. v. Commissioner,76 T.C. 1 (1981); People of God Community v. Commissioner,75 T.C. 127 (1980); Bubbling Well Church of Universal Love, Inc. v. Commissioner,74 T.C. 531 (1980). Accordingly, petitioners' alleged *680 contributions to such organization cannot qualify as charitable contributions under section 170. Moreover, even if local congregation No. 00293 did qualify under section 170(c)(2)(C), the only evidence petitioners have offered in support of their burden of proof with respect to this claimed deduction was petitioner's own testimony. However, petitioner's testimony was vague, internally inconsistent, uncorroborated, extremely evasive and unworthy of belief. We are not required to accept such self-serving testimony, and we do not in this case. Cf. Armes v. Commissioner,448 F.2d 972 (5th Cir. 1971), affg. on this issue a Memorandum Opinion of this Court; Banks v. Commissioner,322 F.2d 530, 537 (8th Cir. 1963), affg. on this issue a Memorandum Opinion of this Court; Weiss v. Commissioner,221 F.2d 152, 156 (8th Cir. 1955), affg. a Memorandum Opinion of this Court. Moreover, petitioner's testimony was, on its face, inadequate to substantiate the claimed deductions. No testimony was given regarding petitioner's cost basis in the property allegedly transferred, or the condition or fair market value of the property on the alleged *681 transfer date. Absent other evidence which would tend to corroborate petitioner's own self-serving and generally inadequate testimony, [11] we find that petitioners have failed to sustain their burden of proving that they are entitled to any portion of the charitable contribution deduction at issue. Accordingly, for the reasons stated above, we will sustain respondent's disallowance of this deduction. II. Deductions Related to "Rental Property"
On their 1979 Federal income tax return, petitioners claimed total cash expenses of $2,087.71 and a depreciation deduction of $607.50 in connection with the rental of the Third Street address. Respondent contends that these claimed deductions are not allowable due to petitioners' failure to establish their entitlement thereto, or if allowable, are limited by the provisions of section 183. We agree with respondent that petitioners have failed to establish their entitlement to these claimed deductions to any degree, *682 and we therefore need not consider the applicability of section 183 to this case. It is well established law that respondent's determination is presumptively correct and the burden of proof to establish a taxpayer's entitlement to a deduction, and the amount thereof, rests with the taxpayer. Rule 142(a); Welch v. Helvering,supra;Estate of Finder v. Commissioner,37 T.C. 411 (1961). In the present case, petitioners claimed as deductible expenditures on their 1979 return the following: Depreciation
$607.50
Repairs and Misc. Expenses
582.60
Exterminators
129.60
Fuel
995.64
Misc.
131.87
Insurance
248.00
Such expenses can only potentially be deductible if they relate to the portion of petitioners' house that was rented during the first six months of 1979. If the expenses relate to petitioners' personal residence, they would be personal expenditures and therefore nondeductible. Section 262. With respect to the items denominated as "Repairs and Misc. Expenses," "Misc.," and "Insurance," petitioners have presented no *683 evidence, testimonial or otherwise, that the amounts claimed were actually paid or, if paid, that the payments related in any way to the portion of their residence which they rented during the first six months of 1979. Accordingly, respondent's disallowance of these deductions will be sustained for petitioners' failure of proof. With respect to the items denominated as "Fuel" and "Exterminators," the parties have stipulated that the claimed amounts were actually paid by petitioners for fuel and exterminators during 1979. However, the parties have not stipulated that these expenditures related to the rental portion of petitioners' house; nor have petitioners offered any evidence, testimonial or otherwise, that the expenses even partially related to the rental portion of the premises. For all this record shows, the utility expenses, as well as the exterminator expenses in issue could have related solely to petitioners' portion of the premises. Moreover, it seems not unlikely that the tenant of the rental portion of petitioners' house may have been required to pay his own utilities and exterminator expenses separately, in light of the fact that the rent charged the tenant was only *684 $900 for a six-month period. It would have been a simple matter for petitioners to enter evidence which would clearly establish the extent to which the expenditures in issue related to the rental portion of their house. Where, as here, petitioners fail to introduce documentary evidence solely within their possession which, if true, might be favorable to them, this failure gives rise to a presumption that, if produced, such evidence would be unfavorable. Stoumen v. Commissioner,208 F.2d 903 (3d Cir. 1953), affg. a Memorandum Opinion of this Court; Lias v. Commissioner,24 T.C. 280 (1955), affd. 235 F.2d 879 (4th Cir. 1956), cert. denied 353 U.S. 935 (1957); Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). In light of these principles, we must sustain respondent's disallowance of petitioners' claimed deductions for "Fuel" and "Exterminators" due to petitioners' failure of proof. Finally, with respect to the depreciation claimed by petitioners on the Third Street *685 address, we must also sustain respondent's determination. Mr. Poldrugovaz purchased this house on March 6, 1973, for a total purchase price of $12,010. Apparently, the entire house was originally used as a residence by Mr. Poldrugovaz and his family. More precisely, petitioners have not established that any portion of the house was leased by Mr. Poldrugovaz immediately after it was purchased. At some undisclosed time thereafter, Mr. Poldrugovaz began leasing a portion of this house to a friend.
In order to be subject to the allowance for depreciation, property must be used in a trade or business or held for the production of income. Sections 167(a)(1) and (2). The amount of allowable depreciation with respect to a piece of property which has been converted from personal to business or income-producing use for the years in issue must be computed by reference to the property's depreciable basis at the date of conversion. For these purposes, the property's depreciable basis at the date of conversion is the lesser of the fair market value of the property at the conversion date or its *686 adjusted basis at such time. Section 1.167(g)-1, Income Tax Regs., Thatcher v. Commissioner,24 B.T.A. 1130, 1132 (1931). Conceding that residential property may be converted to business or income-producing property by rental thereof, Heiner v. Tindle,276 U.S. 582 (1928), and assuming arguendo that petitioners' house was so converted at some undisclosed time, we nevertheless cannot allow petitioners any portion of the depreciation deduction claimed on their return. Petitioners have presented no evidence relating to the date at which their house was partially converted to rental use or the basis and fair market value of the house at that time. Accordingly, we have no basis upon which to determine the amount of any otherwise allowable depreciation deduction, and petitioners therefore fail on this issue for lack of proof. Cf. Thatcher v. Commissioner,supra at 1132. Accordingly, we will sustain respondent's disallowance of petitioners' claimed expenses relating to the Third Street address in its entirety. III. Miscellaneous Deductions
Petitioners claimed as miscellaneous itemized *687 deductions a total of § 1,600.34 on their 1979 return. Petitioners apparently contend that these deductions are allowable as employee business expenses allegedly incurred in connection with Mr. Poldrugovaz's employment as a New York City fireman. Additionally, petitioners claimed a deduction of $1,200 for sales tax on their 1979 return. Respondent disallowed all of the above deductions except for $613 of the sales tax claimed by petitioners. Respondent contends that petitioners have failed to sustain their burden of proving that any of the disallowed deductions were in fact incurred by them. We agree with respondent. Petitioners offered no admissible evidence that any of the claimed miscellaneous expenses or sales taxes were in fact paid by petitioners during 1979. Accordingly, we sustain respondent's determination with respect to these issues. Rule 142(a), Welch v. Helvering,supra.
IV. Addition to Tax
By amended answer, respondent asserted that petitioners are liable for an addition to tax under section 6653(a). Because this issue was raised by respondent *688 for the first time in his amended answer, respondent bears the burden of proof with respect thereto, Rule 142(a).
Section 6653(a) imposes a five percent addition to tax for an underpayment of tax if any portion of the underpayment is due to negligence or intentional disregard of rules and regulations. Respondent maintains that petitioners' claiming of charitable contribution deductions on their 1979 Federal income tax return constituted negligence or intentional disregard of rules and regulations to the extent that such deductions were attributable to "donations" allegedly made to FCR or local congregation No. 00293. Petitioners seek to avoid the section 6653(a) addition to tax by arguing that there was enough information on their return for respondent to determine if it was proper or improper for them to claim the deductions in issue herein. Petitioners' argument misses the mark. Wholly apart from the manner in which the deductions in issue were claimed on their return, the record clearly establishes that the position petitioners chose to take on their return which resulted in the *689 major portion of the underpayment of tax at issue herein, was "at best wishful thinking and at least intentional disregard of the rules and regulations." Ocejo, Jr. v. Commissioner, T.C. Memo. 1983-48, 45 T.C.M. at 587, 52 P-H Memo T.C. Par. 83,048, at 142. Specifically, we refer to petitioners' claimed charitable contribution deductions for items of property which were never transferred to any third party. This action clearly constitutes negligence or intentional disregard for rules and regulations. The addition to tax will be sustained. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The testimony of Jerome Ernest Heinemann, and the exhibits received through such testimony, which were presented in the case of Stojalowsky v. Commissioner,↩ Docket No. 24373-81, have been incorporated in this record by stipulation of the parties.
3. On June 8, 1979, the District Director of Internal Revenue, Newark, New Jersey, sent a letter to the parent Freedom Church of Revelation located at Hohokus, New Jersey, which stated in pertinent part: Based on information supplied, and assuming your operations will be as stated in your application for exemption, we have determined that you are exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. The tax exempt status of the parent Freedom Church of Revelation was retroactively revoked effective for all tax years beginning with the year ended December 31, 1978, by letter dated September 30, 1982, from the Acting Associate Chief of the Internal Revenue Appeals office, Mid-Atlantic Region. The parent Freedom Church of Revelation is currently challenging the Internal Revenue Service's revocation of its exempt status in the District Court of the District of Columbia, pursuant to sec. 7428(c). Freedom Churchof Revelation v. United States,↩ Docket No. 82-3675 (D.D.C., filed 12/18/82).
4. It is relatively clear from this record that, in petitioners' case, their payment of $3,500 to FCR was a mandatory "ordination" "charter" and "education" fee. Admittedly, the $3,500 payment occurred after the dates on petitioners' "ordination certificates" and "congregational charter" and this would tend to indicate that the payment was not made in part in consideration for the certificates and charter, absent other evidence. However, we are unwilling to accept the certificates and charter on their face due to the other evidence of record which demonstrates that FCR was less than accurate in dating documents transmitted to petitioners. For example, although petitioners did not transfer the $3,500 under discussion to the representative of FCR until December 6, 1979, the "receipt" acknowledging said transfer indicates that the transfer occurred on November 15, 1979. Moreover, even assuming the certificates and charter were actually issued to petitioners on November 15, 1979, petitioners' payment to FCR on December 6, 1979, might nevertheless have been in discharge of their prior obligation to pay for the certificates and charter. Absent other convincing evidence of record and in light of the facts that petitioners made no other single contribution in excess of $10 to any other entity in 1979, combined with the testimony of petitioners' own witness that a payment of 10% of an individual's prior year's gross income was normally required to accompany an application to FCR, as well as petitioner's own testimony that a portion of the $3,500 payment was used to discharge expenses of operating Freedom College, we must conclude that this payment was a mandatory fee charged for petitioner's attendance at the seminars and/or "certificates of ordination" and "congregational charter."↩
5. Petitioner specifically testified that an automobile and certain furniture allegedly "donated" to local congregation No. 00293, remained in petitioners' possession after the alleged "donation."↩
6. The depreciation deduction claimed by petitioners on their 1979 return was computed by petitioners as follows: ↩
Cost or
Depreciation
Depreciation
Description
Date Acquired
Other Bases
Method
Life
This Year
Two-Family
1973
$20,478
Straight Line
20
$1,024   Improvements
1973-74
200
Straight Line
20
10   Improvements
1979
543
Straight Line
3
181   Totals
$1,215   x.5
$607.50
7. Petitioners have now conceded that they are, at most, entitled to deduct only one-half of the cash expenditures which they claimed on their 1979 return as rental expenses since they admit that such expenses related to their entire residence. We also note that petitioners separately deducted as itemized deductions mortgage interest and taxes atttributable to their property.↩
8. Petitioners have not favored us with a brief in this case.↩
9. Because we find that petitioners' transfer of $3,500 to FCR did not constitute a "charitable contribution" we need not consider respondent's alternative contention that FCR, the parent organization, failed to qualify as a charitable organization within the intendment of sec. 501(c)(3)↩.
10. Petitioner cannot seriously contend that the exemption letter issued to the parent FCR on June 8, 1979, which was subsequently revoked by the Internal Revenue Service, constituted a group ruling applying to all local congregations of FCR. In any event it is clear that such exemption letter was not a group ruling but rather applied only to the parent FCR.↩
11. Although respondent by way of a subpoena duces tecum, requested petitioners to provide documents which would substantiate this claimed deduction, no such documents were provided to respondent or at trial herein.↩