*Decision will be entered for the respondent.*

TERREL L. MIEDANER AND PENELOPE A. MIEDANER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11625–81.     Filed September 7, 1983.

*D. Michael Romano*, for the petitioners.
*David W. Otto*, for the respondent.

FAY, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income tax:

| Petitioners | Year | Deficiency |
|---|---|---|
| Terrel L. and | 1977 | $9,280 |
| Penelope A. Miedaner | | |
| Terrel L. Miedaner | 1978 | 8,255 |
| | 1979 | 10,546 |

The issues are (1) whether royalties paid on the commercial exploitation of a book are taxable to its author, petitioner Terrel L. Miedaner, (2) whether petitioners are entitled to deductions for contributions made to the Church of Physical Theology, Ltd., and (3) whether respondent is precluded by the doctrine of equitable estoppel from raising the above issues.

## FINDINGS OF FACT

Some of the facts are stipulated and found accordingly.

Petitioners Terrel L. and Penelope A. Miedaner resided in Tucson, Ariz., when they filed their petition herein.

Petitioner Terrel L. Miedaner (hereafter Terrel or petitioner) is a skilled mathematician and scientist. In 1965, he earned a Bachelor of Science degree from the University of Wisconsin in mathematics and electrical engineering. He spent the next 10 years working for the University of Wisconsin Space Astronomy Laboratory, and the next 5 years he worked at the Kitt Peak National Observatory outside Tucson, Ariz., as a computer systems analyst. In June 1979, Terrel left Kitt Peak National Observatory to form a research and development company involving computer technology.

Petitioner Penelope A. Miedaner (Penelope) worked part time for Kitt Peak National Observatory at offices in Tucson. Penelope and Terrel separated in September 1977 and divorced in January 1978, Penelope taking custody of their three children. In February 1978, Penelope terminated her employment with Kitt Peak National Observatory and opened a restaurant in Tucson.

During high school, Terrel realized there were some profound conflicts between his Catholic upbringing and his scientific learning. It is his attempt to resolve this conflict through the writing of a book and the formation of a church that gives rise to the issues herein.

Terrel wrote several manuscripts between 1964 and 1976 dealing with nonfiction religious and philosophical treatments of the nature of man. These manuscripts were submitted to

publishers but were never published. Beginning in 1972, he devoted his attention to writing a novel which culminated in the book entitled "The Soul of Anna Klane," which was published in 1977 by Coward, McCann & Geoghegan (the publisher). With religious overtones, the book attempts to explain the existence of human beings with a complex mathematical religious philosophy on terms the average person can understand.

Pursuant to a publishing contract executed on November 19, 1976, Terrel granted certain exclusive publication and other licensing rights to his book in exchange for royalties. The publisher was given the exclusive right to publish and sell the book in the United States, Canada, and the Philippines. The publisher was also given the nonexclusive rights in all the territories except the British Commonwealth, and it was also given the right to license publication by book clubs and so-called cheap editions. The movie, serialization, and other miscellaneous rights were excluded from the publication agreement.

On December 10, 1976, petitioners executed an assignment which gave the Church of Physical Theology (which was not yet incorporated) "all of their right, title and interest in and to the * * * book." The assignment also recited that the Miedan-ers "simultaneously with the execution of this agreement delivered the complete manuscript of such book to the Assignee to be its property absolutely."

On December 29, 1976, petitioners filed Articles of Incorporation with the State of Arizona for an entity called the Church of Physical Theology, Ltd. (hereafter the church). At about this same time, Terrel directed his publisher to record the copyright for The Soul of Anna Klane in the name of the church. In January 1977, Terrel wrote a letter to his publisher in which he unconditionally guaranteed to fulfill and perform all obligations in the publishing agreement dated November 19, 1976. A few days later, the publisher acknowledged that the author's rights had been assigned to the church and that all payments should be made to the church.

The book met with success and resulted in substantial hardbook and paperback sales. Royalties paid were as follows:

| Year | Source | Royalties |
|------|--------|-----------|
| 1977 | Domestic | $25,775.73 |
| 1978 | Foreign | 12,959.37 |
|      | Movie rights | 2,250.00 |
| 1979 | Domestic | 29,182.44 |

Except for nominal contributions by others (less than $100 total), all income by the church came from the above royalties and the following contributions by Terrel:

| 1977 | ...................... | [1]$10,223.56 |
|------|------|------|
| 1978 | ...................... | 11,379.49 |
| 1979 | ...................... | 4,788.76 |

In late 1976, a checking account was opened in the name of the church. Terrel and Penelope were the only signatories for that account. The funds were used primarily to pay living expenses of Terrel and Penelope with Terrel generally writing a check sufficient to provide funds to write himself a check right back. Terrel and Penelope received the following "living allowances" from the church:

|      | Terrel | Penelope |
|------|--------|----------|
| 1977 | $6,000 | $1,500 |
| 1978 | 6,500 | 5,600 |
| 1979 | 9,490 · | 6,000 |

Penelope's living allowances began after she separated from her husband in September 1977. At no time did Terrel pay child support to Penelope.[2] The increase in Terrel's living allowance in 1979 was due to the increased expenses associated with the maintenance of his house.

In addition to the "living allowances" described above, Terrel received the following amounts from the church as reimbursed expenses:

| 1977 | ...................... | $1,222.92 |
|------|------|------|
| 1978 | ...................... | 1,555.20 |
| 1979 | ...................... | 1,418.61 |

The reimbursed expenses included medical, travel in connection with promoting the book, meeting with attorneys, trips to

---

[1]These amounts are cash contributions except for $200 in 1977, which represents the fair market value of a piano contributed by Terrel.

[2]The divorce decree declared Terrel would have custody of the children, but, in fact, the children remained with their mother.

the grocery store for food and beverage consumed at church meetings, and miscellaneous expenses such as license plates and gas for a Honda Accord licensed in the name of the church. Among the reimbursed medical expenses were vitamins, dental work for Penelope, aspirin, eyeglasses for his daughter, and weight benches and exercise equipment for Terrel.

During the years in issue, the church made six loans, five to the Miedaners and one to a business associate. No collateral was given for the loans. Two loans totaling $14,500 were used by Penelope to open her restaurant in 1978. A $5,000 loan in 1978 was used by Terrel as a downpayment on a new house. Another $3,000 loan in 1978 is unexplained. A $700 loan was made to an associate, the proceeds of which were used to cover a check written by that associate.

In addition, Terrel used church funds to purchase assets worth over $18,000. These assets included a home computer and related equipment, office furniture, a Honda Accord, a television set, a record player, refinishing cost of a piano, and a "fuzz-buster."[3] All these assets were kept in either Terrel's or Penelope's house. Penelope kept the piano, the turntable, and an office desk. Terrel kept the computer equipment, the television, the camera, the car, and other office furnishings.

The church held monthly discussions at the home of either Penelope or Terrel. After Penelope opened her restaurant in 1978, meetings were occasionally held at the restaurant. Exclusive of the Miedaners, attendance included groups of 6 to 10 individuals, typically co-workers from Kitt Peak National Observatory including astronomers, scientists, and computer people. These "intense intellectual discussions," as described by Terrel, were the primary public functions of the church. In 1977, the church had about 10 active members and by 1983, it had 30 active members. The church performed six marriages during 1977–79. Terrel also gave lectures and did promotional work for the book through the church.

---

[3] A "fuzz-buster" is a device used by motorists to interfere with the radar detection system used by law enforcement officers. Although this device may have hindered the enforcement of traffic laws against petitioners, it is not equipped to interfere with this Court's enforcement of the tax laws.

Both Terrel and Penelope had employment agreements with the church. There was also a Medical Reimbursement Plan of the church and a Death Benefit Agreement between Terrel and the church. The church also had a set of canons expressing its religious doctrines.

Petitioners filed on behalf of the church an application for recognition of exempt status under section 501(c)(3).[4] This application included a representation that the source of church income would be book royalties, total membership fees of $200 per year, and a small amount of contributions of $50 per year. The exemption was granted May 20, 1977. At no time during the application process did petitioners state that a major source of income for the church would be contributions from Terrel or that the church would pay for Terrel's personal expenses, unsecured loans to petitioners, or for the purchase of personal assets.

On their Federal income tax returns, petitioners claimed charitable deductions of $9,925, $11,363.50, and $3,989.76 for 1977, 1978, and 1979, respectively. In addition, petitioners did not include in income any of the more than $70,000 in royalties paid to the church. In his notice of deficiency, respondent determined the royalty income was taxable to petitioners and that no charitable deductions were allowable.

## OPINION

Petitioner Terrel L. Miedaner is a scientist and a deeply religious individual who combined his two passions by forming a church and writing a book in which his religious beliefs are expressed. The book met with success and generated substantial royalties which were assigned by petitioner to his church. The question is who is taxable on these royalties.

Both parties see the issue as a classic "fruit-of-the-tree" problem. Petitioners claim that despite the fact that they assigned almost all rights to the book to the publisher, they nevertheless retained enough interest in the property that any subsequent assignment is sufficient to shift the incidence of taxation. Petitioners further argue that the bare right to

---

[4]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

receive royalties is a property right in the nature of a chose in action which can be validly assigned. Respondent argues the assignment to the church of all interest in the book was ineffective as a matter of law since those rights had already been conveyed to the publisher. Since petitioner assigned his rights in the book to the publishers (except movie rights and other incidental rights), no property rights were transferred to the church.[5] Thus, respondent argues there was simply a naked anticipatory assignment of income.

We find it unnecessary to analyze in detail the cases dealing with the "assignment of income" doctrine, which often turn on fine lines of distinction. Rather, we decide this issue on the basis of the totality of the factual circumstances, and on this basis, we hold petitioner must be taxed on the disputed amounts of royalty income.

When an author writes a book, the literary ideas embodied in the manuscript are property. *Lewis v. Rothensies*, 61 F. Supp. 862 (E.D. Pa. 1944), affd. per curiam 150 F.2d 959 (3d Cir. 1945). When he sells it in exchange for royalties, his interest in the contract by which the royalties are paid is also property in the nature of a chose in action. *Reece v. Commissioner*, 24 T.C. 187 (1955), affd. 233 F.2d 30 (1st Cir. 1956); *Lewis v. Rothensies, supra.* When, however, the assignment does not purport to convey any interest in the book or the royalty contract itself, it amounts to an anticipatory assignment of income. *Rohmer v. Commissioner*, 14 T.C. 1467 (1950); *Lewis v. Rothensies, supra.*

Petitioners purported to transfer "all of their right, title, and interest * * * to the * * * book" titled "The Soul of Anna Klane" to the church. However, as respondent contends, it is true that a substantial portion of these rights had already been transferred exclusively to the publisher. Therefore, no interest in these rights was available for assignment to the church. Moreover, there was no formal assignment of the royalty contract itself. Although the contract was expressly assignable by either party, it could only be assigned with the written consent of the other. The publisher's letter of January 26, 1977, to petitioner is simply an acknowledgement that

---

[5]Consistent with his theory, respondent concedes that $2,250 of 1978 royalties attributable to movie rights are not taxable to petitioner Terrel L. Miedaner since those movie rights had not previously been assigned to the publisher.

royalties will be paid, as directed by the author, to the church. It does not purport to waive or consent to the assignment or relinquishment of any contractual rights vis-a-vis the author. Indeed, it appears the publishing company would not agree to such an assignment. By letter to the publisher dated January 21, 1977, Terrel Miedaner wrote:

As an inducement to you to accept an assignment of the Agreement to the [church], I hereby unconditionally guaranty, promise and agree that all obligations imposed upon me under the agreement will be faithfully performed and fulfilled at the time and in the manner therein provided.

Thus, petitioner unconditionally guaranteed all obligations under the contract. This point distinguishes this case from *Reece v. Commissioner*, 24 T.C. 187 (1955), affd. 233 F.2d 30 (1st Cir. 1956), where the taxpayer assigned the royalty contract to his wife and this assignment was accepted by the purchaser of the patent. Indeed, the First Circuit Court of Appeals found the publisher's acceptance amounted to a novation. Under the circumstances presented herein, we find petitioner has simply directed the publisher to make royalty payments to his church with no simultaneous transfer of an interest of some kind in the property itself.

The most compelling factor before us, however, is that the church was created and operated by petitioner Terrel L. Miedaner as nothing more than his alter ego. Soon after Terrel sold the publication rights, the church was incorporated, and thereafter it acted as a vehicle through which petitioner promoted his own book. For instance, included in petitioner's duties as "minister" were preparing the book for publication, negotiation of movie rights, taking a trip to New York City to meet with a producer of screenplay adaptations of books, and bookkeeping. In addition, assets held in the name of the church were either directly related to publishing and promoting the book or were strictly personal in nature. Those assets included a piano, a record player, a car, a home computer with a word processor, and a "fuzz-buster." Meanwhile, petitioner exercised total control over church expenditures and, as respondent puts it, he bathed himself in personal benefits.

With the religious doctrines being advanced by the book, petitioners assert they were simply attempting to maximize the money available to carry on the church's teachings. However, we fail to see any discernible separate identity

between petitioner and his church. Instead of serving any true religious or charitable purpose, the church served nothing more than the personal interest of petitioner, either through daily living expenses or through the commercial exploitation of his own book.[6] We do not doubt the sincerity of petitioner's beliefs, but we cannot avoid the conclusion that he used the church for his own purposes. It is simply an attempt to transmute the commercial into the ecclesiastical and thus avoid the congressional separation of individual taxable income and exempt religious income. This is not permitted. See *McGahen v. Commissioner*, 76 T.C. 468, 480 (1981), affd. without published opinion ___ F.2d ___ (3d Cir. 1983).

It is apparent the sole reason for incorporating the Church and transferring the royalty rights to the book was an attempt to avoid taxes whereby royalty income would be exempt and any contributions would generate a deduction.[7] Tax avoidance is not a religious purpose. *Ecclesiastical Order of the ISM of AM v. Commissioner*, 80 T.C. 833 (1983), on appeal (6th Cir., July 6, 1983).

Under these circumstances, we hold petitioner's attempt to shift the incidence of taxation on the royalty income to be ineffective. He has not changed or altered his position in the slightest. He retains the same legal position with respect to his publisher, and he has retained the right to exercise and, in fact, has exercised, total control over the royalty income. Income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as income. *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). Petitioner has retained sufficient power and control over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes. *Commissioner v. Sunnen*, 333 U.S. 591 (1948).

---

[6] See *Bronner v. Commissioner*, T.C. Memo. 1983-91, where this Court held that all the income from the taxpayer's soap manufacturing business belonged to the taxpayer rather than his church. The taxpayer, who came from a family of chemists, was a rabbi and soap maker who espoused his religious principles on the labels of his soap products. There was essentially no distinction between the taxpayer and his church.

[7] Petitioners' "holier than thou" testimony shouts to the high heavens that the purpose of the church was tax avoidance, not religion. Their scheme is as transparent as a clear day in the Rocky Mountains. They kept shouting religion, religion, religion, but the Court kept hearing tax avoidance, tax avoidance, tax avoidance.

## Charitable Contributions

In order to be entitled to a charitable deduction for amounts paid to the church, petitioners must prove that no part of the net earnings of the church inured to the benefit of any private shareholder or individual. Sec. 170(c)(2)(B) and (C). As noted in our prior discussion, the church was essentially inseparable from the personal interests of Terrel and Penelope, and we agree with respondent's observation that petitioners literally bathed themselves in personal benefits. Their "contributions" funded their living allowances, and not coincidentally, these contributions approximated one-half of petitioners' adjusted gross income.[8] The church account was simply a magic wand whereby personal expenses were converted into tax deductions. Where contributions go to pay personal expenses, they are neither charitable nor deductible. We summarily reject petitioners' argument that these "living allowances" represent compensation for services performed for the church. Accordingly, petitioners are allowed no deductions for their "contributions."

## Estoppel

Petitioners argue the issuance by respondent of the exemption letter on May 20, 1977, now precludes him from challenging either the royalties or the charitable deductions. They claim full disclosure of the book assignment was made in both their Application for Recognition of Exemption and related correspondence with the Service. However, in the application, petitioners represented that the church would not limit its benefits to specific classes of individuals; thus, it fails to disclose that the church existed for petitioners' own personal benefit. Moreover, the application failed to disclose that substantial contributions would be made by the founder of the church. Accordingly, we see no reason why respondent may not challenge these items. The church has been "operated in a manner materially different from that originally represented." See sec. 601.201(n)(6)(i), Statement of Procedural Rules. *Presbyterian & Reformed Publishing Co. v. Commissioner*, 79

---

[8]Generally, an individual's charitable contributions deductions for a given year is limited to 50 percent of his adjusted gross income. See sec. 170(d).

T.C. 1070 (1982), on appeal (3d Cir., July 6, 1983). We note this is not a case where an unrelated third party has relied on an exemption letter; rather, we are dealing with the founder of the church himself.

Petitioners also claim respondent intentionally delayed mailing the notice of deficiency for 1977, 1978, and 1979 until the statute of limitations expired with respect to 1976 in order that the initial conveyance or assignment of the book could not be considered. Respondent, however, is free to challenge items even though they were reported and not adjusted in prior years. See *Ginsberg v. Commissioner*, 24 T.C. 273 (1955). Simply because the statute of limitations has run for 1976 does not mean facts occurring in 1976 cannot be considered for an open year. Accordingly, we reject petitioners' argument that respondent cannot now question the royalty income or the charitable deductions.

In conclusion, our tolerance for taxpayers who establish churches solely for tax-avoidance purposes is reaching a breaking point. Not only do these taxpayers use the pretext of a church to avoid paying their fair share of taxes, even when their brazen schemes are uncovered many of them resort to the courts in a shameless attempt to vindicate themselves. When such frivolous cases are brought to this Court, there is a question as to whether damages should be imposed under section 6673.[9] Although we have decided not to impose such damages in the instant case, if taxpayers continue to make frivolous claims with respect to churches established solely for tax-avoidance purposes, serious consideration will be given to imposing such damages in those cases. See *Hatfield v. Commissioner*, 68 T.C. 895 (1977).

To give full effect to all concessions,

*Decision will be entered under Rule 155.*

---

[9]In the years at issue, sec. 6673 provided:

Whenever it appears to the Tax Court that proceedings before it have been instituted by the taxpayer merely for delay, damages in an amount not in excess of $500 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax.

In cases commenced after Dec. 31, 1982, the Court may impose damages up to $5,000. See sec. 292(g), Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 97 Stat. 574.