RONALD H. RUTTER AND LYNDIA M. RUTTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rutter v. Commissioner
Docket No. 20991-83.
United States Tax Court
T.C. Memo 1985-368; 1985 Tax Ct. Memo LEXIS 264; 50 T.C.M. (CCH) 506; T.C.M. (RIA) 85368; July 23, 1985. *264 Held, because petitioners failed to carry their burden of proving that they actually made charitable contributions to an organization organized and operated exclusively for religious purposes, no part of the net earnings of which inured to the benefit of any private individual, petitioners are not entitled to deductions for contributions allegedly made during 1980 and 1981. Held further, petitioners are liable for the addition to tax under section 6653(a)(1), I.R.C. 1954, for the years in issue. Held further, damages are awarded under section 6673. Ronald H. Rutter, pro se. J. L. Millward, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated May 25, 1983, respondent determined that petitioners are liable for deficiencies and additions to tax as follows: Addition to tax under
Year
Deficiency
section 6653(a)(1)
1980
$2,137
$107
1981
1,414
71
The issues for decision are (1) whether petitioners are entitled to deductions under section 170(a), I.R.C. 1954, for the taxable years 1980 and 1981 for contributions purportedly made to the Universay Life Church (ULC); (2) whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1) for each of the years in issue; and (3) whether damages should be awarded to the United States pursuant to section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. At the time they filed their petition herein, Ronald H. Rutter *266 and Lyndia M. Rutter, who are husband and wife, resided at 3701 Woodside Drive, Carson City, Nevada. Petitioners filed joint Federal income tax returns for the years in question with the Office of the Internal Revenue Service at Ogden, Utah. On their 1980 and 1981 returns petitioners claims deductions of $10,887 and $8,964, respectively, for charitable contributions to the ULC. Respondent disallowed said deductions. OPINION The first issue for decision is whether petitioners are entitled to charitable contribution deductions under section 170(a). To establish that they are entitled to the claimed contribution deductions, petitioners have the burden of proving that the contributions actually were made to or for the use of an organization organized and operated exclusively for religious purposes, no part of the net earnings of which inured to the benefit of any private individual within the meaning of section 170(a)(1), (c)(2)(B), and (C). Welch v. Helvering,290 U.S. 111 (1933). Although the record herein is not entirely clear, it is petitioners' apparent contention that, during the years in issue, they made cash contributions to or for the use of ULC Modesto, *267 as opposed to any distinct local ULC organization. [1] Petitioners introduced into evidence copies of two documents, written on a letterhead of ULC Modesto, purporting to acknowledge total contributions of $13,552.58 and $8,964.04 in 1980 and 1981, respectively. In addition, petitioners introduced into evidence copies of documents entitled "ULC Receipt for Donation" and containing the preprinted name and address of ULC Modesto. These latter documents purported to acknowledge receipt of numerous individual cash deposits to ULC Modesto during 1980 and 1981. The foregoing documents, which were uncorroborated at trial, are so suspect in nature that they cannot possibly establish that petitioners made cash contributions to ULC Modesto during the years in question and in the amounts claimed by petitioners. The first two documents, purporting to acknowledge total contributions during 1980 and 1981, and "fill-in-the-blank" preprinted forms with petitioners' names and address, the years in issue, and the amount of the alleged contributions inserted by a different typewriter. *268 Having observed petitioners at trial and having listened to their testimony, we find it not at all unlikely that petitioners filled in the blanks to suit themselves. The second group of documents, entitled "ULC Receipt for Donation," are equally lacking in trustworthiness. A large number of these documents were purportedly signed by one Myra Lauderbaugh. Others were purportedly signed by one Christine A. Beasley. According to petitioners, these signatories were authorized members of the ULC who received the cash and who, at the time they signed the documents, were located in Carson City. When asked by the Court whether petitioners had made any effort to have the signatories appear at trial, Mr. Rutter testified that he was not sure where they might be and had not made any effort to find them. Mr. Rutter's representation to the Court was disingenuous, at best, as respondent's counsel subsequently was able to elicit an admission from Mr. Rutter that Myra Lauderbaugh is, in fact, a neighbor of petitioners, who in Mr. Rutter's words, lives "[a]cross the street and a little ways up, about two, three houses." Under these circumstances, petitioners' failure to call Myra Lauderbaugh *269 as a witness gives rise to the presumption that, had they done so, her testimony would have been unfavorable to them. Cf. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In short, we will accord no weight to the documents relied upon by petitioners to support their contention that they made cash contributions to ULC Modesto. A fundamental prerequisite to a charitable contribution deduction under section 170(a) is that the taxpayer actually make a contribution. At trial, Mr. Rutter testified that the signatories of the receipts received the cash as authorized members of the ULC. His subsequent elaboration on that testimony bears repeating herein (questions by respondent's counsel, answers by Mr. Rutter): Q. Now, did any of the people whose signatures appear in these receipts * * * -- what did they do with the money? If you know. A. If I know. Well, they received the money, it was placed in the cash box marked Universal Life Church. Q. In the cash box. And where was the cash box? A. Where was it? It was kept in the official office of the local group. Q. And where was that?
*270 A. That was in my house. Q. In your house. And then--so, you actually had possession of this money that was in the cash box. So, where did it go from there? A. Where did-- Q. Well, presumably, if you had control of the box--did you have access to the box? A. There was access. Q. Did you have access to the box? A. Could have had. Q. Did you--did this money go from the box to ULC Modesto, Inc.? MRS. RUTTER: You're giving him church-related information now. [2]
THE WITNESS: This is true, this is church-related on the actual-- MR. MILLWARD: Well, I fail to see how it's church-related, Your Honor, when he's testifying that he's got the money in his house and he was acting on behalf of the church, presumably as an agent, and he got the money. * * * * * * THE COURT: * * * Is it your contention, Mr. Rutter, that you made the contribution to the church in cash and that you put the cash in a box which you kept in your house; is that right? That's what you just said, as I understood it. THE WITNESS: Yes. THE COURT: Is that correct? THE WITNESS: That's correct. THE COURT: However, you cannot tell us what happened to the cash. Is the cash still in the *271 box? THE WITNESS: All the monies in that box were authorized in and out on--for church liabilities. THE COURT: Who authorized the out? THE WITNESS: The--all money in and out was authorized by Modesto, California. THE COURT: What individual? THE WITNESS: It was the board of directors in Modesto, actually the board of directors, Modesto, granted the authority to three people usually in the local area. THE COURT: And who were those three people? THE WITNESS: I was one, as a pastor and the secretary and-- * * * THE COURT: There were three. You were one. Who were the other two? MRS. RUTTER: Think about this a second. THE COURT: Was your wife one of them? THE WITNESS: Yes. THE COURT: Who was the third? THE WITNESS: Myra was for one year or part of the year. THE COURT: That's Myra-- THE WITNESS: Lauderbaugh. THE COURT: The one who's your neighbor. THE WITNESS: Yes. THE COURT: What did you use the money for when you took it out? THE WITNESS: Did I use if for? THE COURT: Yes. THE WITNESS: * * * I'm afraid we've broken into the actual affairs of the church and how they function and the authorizations of--from the mother church and who they handle *272 their administrations. The local people would, by resolution, they would pay the expenses authorized by the local board, which-- THE COURT: What expenses? * * * THE WITNESS: Under Publication 525, there's certain expenses which a church can authorize to pay its ministers and everything that was paid out was under that. * * * THE COURT: * * * What expenses of yours did they pay? THE WITNESS: House. MRS. RUTTER: They didn't pay your expenses. THE WITNESS: This is true, they didn't pay my expenses. They paid a housing allowance. Despite petitioners' general evasiveness throughout trial, it is readily apparent from the entire record that the so-called "church liabilities" that were authorized to be paid out of petitioners' alleged cash contributions were personal expenses of petitioners, such as petitioners' home mortgage payments. Absolutely nothing in the record would support the conclusion that the payment of such expenses represented compensation for any services Mr. Rutter performed as a minister of the ULC. *273 Frankly, we have serious doubts that any cash actually was transferred from petitioners' pockets to their strongbox and have declined to make such a finding of fact. However, even if such a technical transfer occurred, it would not change the fact that petitioners never parted with dominion and control over the cash and never made actual charitable contributions to any organization, let alone to an organization organized and operated exclusively for religious purposes, no part of the net earnings of which inured to any private individual. In our view, petitioners have participated in a scheme that can only be described as a transparent sham. Since we conclude that petitioners made no charitable contributions during the years in issue, we hold against them on the section 170 issue. The second issue for decision is whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1). Petitioners bear the burden of proving that their 1980 and 1981 underpayments were not due to negligence. Rule 142(a), Tax Court Rules of Practice and Procedure; Enoch v. Commissioner,57 T.C. 781, 802 (1972). Petitioners presented no credible evidence to *274 establish that said underpayments were not due to negligence. Accordingly, we sustain respondent's determination that petitioners are liable for the addition to tax for negligence under section 6653(a)(1) for each of the years in issue. The final issue for decision is whether damages should be awarded to the United States pursuant to section 6673. That section provides, in part, that "[w]henever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $5,000 shall be awarded to the United States by the Tax Court in its decision." A review of the entire record herein convinces us that petitioners used the pretext of a church to avoid paying their fair share of taxes. Their brazen scheme having been unconvered by respondent, petitioners then resorted to this Court in a shameless attempt to vindicate themselves. Miedaner v. Commissioner,81 T.C. 272 (1983). They did so notwithstanding the knowledge, by their own admission at trial, that they had little chance of prevailing in *275 their case. We conclude with no hesitancy that petitioners knew their case to be premised on frivolous grounds and that they instituted this proceeding primarily for delay. Hence, we award damages to the United States in the amount of $3,500 pursuant to section 6673. Decision will be entered for the respondent.
Footnotes
1. At trial, Mr. Rutter stated that he did not claim that the ULC had a local congregation in Carson City, Nevada.↩
2. At the inception of trial, petitioners informed the Court that they would not respond to questions regarding the internal affairs of the ULC.↩