DAN E. and MERIDON N. WARDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Warden v. Commissioner
Docket No. 4450-85.
United States Tax Court
T.C. Memo 1988-165; 1988 Tax Ct. Memo LEXIS 186; 55 T.C.M. (CCH) 632; T.C.M. (RIA) 88165; April 20, 1988; As amended April 20, 1988 Dan E. Warden, pro se. Elizabeth Girafalco Chirich and Sheri A. Wilcox, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to Special Trial Judge Couvillion pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) of the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) of the Code [1] and Rule 180 et seq. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: In a notice of deficiency, respondent determined the *189 following deficiencies and additions to petitioners' Federal income taxes: Additions to Tax
Section
Section
Section
Section
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
6661(a)
1980
$ 2,555.85 $ 749.21
* $ 153.99  --
--
1981
$ 17,405.52
--
$ 870.27     **
--
1982
$ 23,560.15
--
$ 1,178.00   ***
$ 2,356.00
In one amendment to the answer, respondent increased the deficiency for 1982 from $ 23,560.15 to $ 34,393.05. In another amendment, respondent increased the 1982 addition to tax under section 6661(a). The parties made numerous pre-trial concessions, leaving for decision: (1) Whether $ 5,791.80 of insurance commissions received by petitioners in 1980 constituted taxable income for that year; (2) whether $ 5,488 and $ 13,926.89, received by petitioners as insurance commissions in 1981 and 1982, respectively, but held in escrow by a third party for payment of contingent claims, was excludable from their income for said years; (3) *190 whether insurance commissions of $ 8,181.05 received by petitioners in 1982 constituted taxable income where the insurance company paying the commissions failed to report the payments on information returns (Form 1099) required by law; (4) whether petitioners were entitled to certain charitable contribution deductions in 1981 and 1982; (5) whether petitioners were entitled to certain trade or business expense deductions for 1980, 1981, and 1982 in excess of amounts conceded by respondent; and (6) whether petitioners are liable for additions to tax under sections 6653(a) and 6661(a). [2] In addition, respondent filed a motion for damages under section 6673. FINDINGS OF FACT -- GENERAL Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided at College Station, Texas, at the time they filed their petition. They filed joint Federal income tax returns for 1980, 1981, and 1982. For convenience, due to the number of issues involved, our remaining findings of fact and opinion *191 are considered by issue.
ISSUE 1. Insurance Commission Income -- 1980.
FINDINGS OF FACT During the years in question, Dan E. Warden (petitioner) was a self-employed insurance agent. He also received income in 1980 and 1981 from the Church of Christ of Hearne, Texas (Church of Christ) as a minister. His wife, Meridon Warden, also earned income primarily from real estate commissions. During 1980, petitioner received insurance commissions from two insurance companies totaling $ 22,990. However, the information returns (Forms 1099) filed by the insurance companies reflected only $ 17,198.20 as having been paid to petitioner during 1980. Although petitioners reported $ 22,990 on their income tax return for 1980, at trial petitioner contended that the correct income from these two companies was $ 17,198.20, as shown on the Forms 1099. Petitioners explained that the $ 5,791.80 difference between what they received and what was shown on the Forms 1099 represented advanced yearly commissions paid by the insurance companies on policies sold in 1980, whose annual anniversary date extended into 1981. For example, if petitioner sold a policy on July 1, 1980, and the policy holder *192 elected to pay the premium on a monthly basis, the insurance company, as a practice, would nevertheless pay petitioner up front, as the selling agent, either all or up to 75% of the annual commission due him for the sale of the policy. Thus, for the policy sold on July 1, 1980, one-half of the commission was attributable to 1980, and the other half was attributable to 1981. The information returns filed by the insurance companies only reflected commissions attributable to the year 1980 and thus accounted for the $ 5,791.80 difference in what petitioner received and the amounts shown on the Forms 1099. Petitioner testified that this practice of the insurance companies was followed in this manner until 1983. Petitioners, in support of their contention that $ 5,791.80 should be excluded from their 1980 income, argued that, in the event a policy holder terminated his policy prior to the end of the first anniversary year, petitioner was required to refund or return the advanced commissions he had received on that policy for that portion of the lapsed policy year. Thus, because of the contingency that some of his advanced premiums might have to be paid back because of lapsed policies, *193 petitioners' commission income should be limited to what was reported by the insurance companies. OPINION Section 61 and section 1.61-2, Income Tax Regs., provide that gross income means all income from whatever source derived and that commissions received are included in determining the gross income of a taxpayer. It is petitioners' position that the $ 5,791.80 for the post-1980 portions of the policies did not constitute compensation when received. Petitioners argue, in essence, that the post-1980 advances were loans rather than compensation for services and, hence, should be taxable when earned. Respondent's position is that the advances represented compensation for services; that the insurance companies neither intended to loan money to petitioner, nor did petitioner intend to repay such advances except by offsetting future commissions against the advances; and that the advances constituted income in the year of receipt. Advances of commissions to a taxpayer under an agreement that places no personal liability of repayment on him constitute income to the recipient when the advances are received. Moorman v. Commissioner,26 T.C. 666, 674 (1956); *194 Drummond v. Commissioner,43 B.T.A. 529, 532-533 (1941). Such advances of commissions are nothing more than advance salary or other payment for services which are includable in income by a taxpayer when received. Beaver v. Commissioner,55 T.C. 85, 90 (1970). However, if there is an unconditional personal obligation of a taxpayer to repay an amount advanced to him, the advance may be a loan which would not be includable in income, since the concept of income excludes loans which must unconditionally be repaid. James v. United States,366 U.S. 213, 219 (1961). Whether an advance is income or is a loan is a question of fact to be determined from a consideration of all the circumstances surrounding the making of the advances. Beaver v. Commissioner, supra at 91; New England Tank Industries of New Hampshire, Inc. v. Commissioner,50 T.C. 771, 777 (1968), affd. 413 F.2d 1038 (1st Cir. 1969). Considering all the facts and circumstances of this case, we conclude that petitioners failed to establish that they were under an unconditional obligation to repay the advances to the insurance companies. *195 Petitioners presented no evidence that the $ 5,791.80 was a loan and not compensation or that they returned any portion to the insurance companies from which it was earned. Moreover, if a policy lapsed, resulting in a debt owed by petitioner to the insurance company, in practice petitioner did not return the advanced commissions to the insurance company. Instead, the insurance company offset the debt out of future commissions. Even if we assumed that petitioner had an obligation to return a portion of the advances if policies lapsed or were canceled, petitioners still would not have been entitled to exclude these amounts from their 1980 income. Commissions are taken into income when received, even though there is a possibility that some portion of the amount might have to be refunded to the insurance company if the policy is canceled. Van Wagoner v. United States,368 F.2d 95 (5th Cir. 1966). This conclusion is consistent with numerous cases holding that amounts received under a claim of right are includable in income when received, even though at some later date some of the amounts may have to be refunded. See North American Oil Consolidated v. Burnet,286 U.S. 417 (1932); *196 Van Wagoner v. United States, supra.Petitioners' claim, therefore, is denied.
ISSUE 2. Exclusion From Income of Amounts Held in Escrow -- 1981 and 1982.
FINDINGS OF FACT During 1981 and 1982, petitioner sold life insurance as an agent for National Home Life Assurance Company (NHLA), Massachusetts Indemnity and Life Insurance Company (MILIC), Great American Reserve, Old Equity Mutual Life Insurance Company (Old Equity), and University Life Insurance of America (University Life). During the two years, petitioner was associated with other agents in a marketing organization called Creative Financial Concepts, Incorporated (CFC). CFC designed a marketing scheme in which the agents were arranged in a pyramid structure. CFC was the apex of the pyramid. Petitioner, a regional vice-president of CFC, was located immediately below CFC in the pyramid. Below the regional vice-presidents were agents recruited by the vice-presidents. New recruits recruited by agents were at the bottom of the pyramid structure, directly under the agent who recruited them. Each agent received a portion of the commissions (an overwrite) earned by agents he recruited and which formed the *197 successive levels of the pyramid. Initially, during 1981 and part of 1982, all of the agents associated with CFC, including petitioner, sold insurance primarily through University Life. University Life was chosen primarily because it agreed to accommodate CFC by dividing the commissions payable in accordance with the CFC pyramid structure and by sending checks directly to each agent entitled to a portion of the commission. In other words, if a sales agent at the bottom of the pyramid sold a policy, University Life would send his percentage of the commission directly to him. In addition, University Life would send the percentages of the commission due to all of the agents, including CFC, superior to the sales agent in the pyramid structure. Beginning in September 1982, CFC and its agents began selling insurance principally through Old Equity. Old Equity, at the request of the CFC agents, pursuant to assignment agreements, sent all commissions earned by CFC agents, including petitioner's, to CFC. CFC retained its portion of the commissions and then distributed the balance of the commissions directly to the regional vice-presidents, who constituted the level immediately below *198 CFC and which included petitioner. The commissions were then distributed by the regional vice-presidents to each successive level of agents. As noted earlier, when an agent sold a policy to a client who paid the premium monthly rather than annually, the insurance company often advanced the agent his total yearly commission, or a substantial portion thereof. If the policy lapsed or was later canceled, the agent owed the insurance company for the portion of the advance commission that related to the lapsed portion of the policy. CFC agreed to reimburse University Life and Old Equity on behalf of the agents working through CFC for "lapsed policy" commissions. CFC then sought reimbursement directly from the appropriate agent. To ensure it would have funds available to repay advanced commissions on lapsed policies, CFC required each of its agents, including petitioner, to deposit a percentage of their commissions as security "to meet any debt incurred by the [sales agent] pursuant to his General Agent's Contract with [University Life and Old Equity]." The amounts deposited with CFC were placed in a bank escrow account. Each agent was assigned an individual sub-account, but *199 had no signatory authority on the account. Petitioner agreed to pay 20 percent of his commission income into the CFC Escrow Account beginning in May 1981. Petitioner's deposits to the CFC Escrow Account were made under three different procedures during the years in question. First, petitioner personally made deposits to the account totaling $ 5,488 during 1981 and $ 680.34 during 1982. Second, in 1982, petitioner entered into a "Partial Assignment and Direction to Pay" agreement with University Life, whereby University Life paid 20 percent of petitioner's monthly commission income into the CFC Escrow Account. The agreement between petitioner and University Life stated that payment by University Life "to the Escrow Account is an accommodation to [petitioner], solely at [petitioner's] request." The agreement could be automatically terminated upon ten days' written notice by petitioner. Pursuant to the agreement, University Life paid $ 11,136.94 of petitioner's commissions directly to the CFC Escrow Account in 1982. Third, in 1982, CFC retained $ 1,636.21, which was 20 percent of the Old Equity commissions earned by petitioner in 1982, and deposited that amount into the CFC *200 Escrow Account. Petitioner was free to terminate his agreement with CFC without cause, giving ten days' notice. Upon termination of the agreement, CFC was obligated to remit the balance of the account to petitioner. CFC was authorized to offset debts owed to it prior to remitting the balance. Petitioner presented no evidence that CFC offset any amount from his balance held in the CFC Escrow Account during the years at issue. Furthermore, if petitioner sold a policy which later lapsed, the CFC Escrow Account was not used to pay back the insurance company for the amounts that had been advanced on that policy; instead, the insurance company offset the lapsed policy amount from future commissions. Petitioners claimed an exclusion of $ 13,926.89 on their 1982 return for amounts placed in escrow with CFC. In an amended answer, respondent determined that the escrow account represented taxable income and should not be excluded. Although petitioners did not take a similar exclusion on their 1981 return, at trial they claimed an exclusion for the $ 5,488 placed in the CFC Escrow Account during 1981. OPINION Section 61 provides that gross income means all income from whatever *201 source derived and encompasses compensation for services, including fees and commissions. Section 61(a)(1). The commissions paid directly to petitioner by University Life in 1981 and part of 1982 are compensation for services. The fact that petitioner sent 20 percent of the commissions, by personal check, for deposit into the CFC Escrow Account does not alter this conclusion. The power to dispose of income is the equivalent to ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it. Helvering v. Horst,311 U.S. 112, 118 (1940). Accordingly, the $ 5,488 and $ 670.34 commissions deposited by petitioner into the CFC Escrow Account in 1981 and 1982, respectively, are includable in petitioners' gross income. This rationale also applies to the amounts deposited directly by University Life and Old Equity into the CFC escrow account, because petitioner had an "unfettered right" to direct payment of those amounts in any manner. The language of section 61, "all income from whatever source derived," has been held to encompass within the definition of gross *202 income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955). The Supreme Court in James v. United States, supra at 29, held that amounts received "without the consensual recognition, express or implied, of an obligation to repay, and without restriction as to their disposition" constitute income to the recipient "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent," quoting North American Oil Consolidated v. Burnet, supra at 424. A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States,343 U.S. 130, 137 (1952). It is the economic benefit accruing to the taxpayer that is the controlling factor in determining whether a particular gain is "income." Commissioner v. Glenshaw Glass Co., supra.
Petitioners exercised "complete dominion" over the commissions within the meaning of *203 Glenshaw Glass. Petitioner was free to instruct the insurance companies to remit his commission income directly to him. Further, petitioner voluntarily entered into an agreement with University Life to send 20 percent of his commissions into the CFC Escrow Account. Petitioner, likewise voluntarily requested Old Equity to send 100 percent of his commissions to CFC with the knowledge and approval that CFC was to retain 20 percent to be deposited to his sub-account of the CFC Escrow Account and way to pay him the remaining 80 percent. Moreover, petitioner could unilaterally terminate either agreement at any time. Based on the foregoing, petitioners' claim for 1981 is denied and respondent's determination on this issue for 1982 is sustained. However, the Court finds that, for 1982, the escrow account was $ 13,443.49, instead of $ 13,926.89 and, to that extent, petitioners are sustained.
ISSUE 3. Additional Insurance Commission Income -- 1982.
FINDINGS OF FACT During 1982, petitioner (and all other agents involved with CFC) began selling insurance for Old Equity. As discussed above, at petitioner's request, pursuant to the assignment agreement, Old Equity sent all of *204 his commissions to CFC. CFC retained 20 percent of petitioner's Old Equity commissions, which were deposited into the CFC Escrow Account. The remaining 80% was sent by CFC to petitioner. In 1982, 20 percent of petitioner's Old Equity commissions retained by CFC for deposit into the escrow account was $ 1,636.21. [3] The remaining 80 percent sent to petitioner in 1982 was $ 6,544.84. On their 1982 return, petitioners failed to report any Old Equity commissions. [4] Additionally, Old Equity did not issue a Form 1099 to petitioners for their 1982 commission earnings. The notice of deficiency did not address the $ 8,181.05 Old Equity commissions; however, at trial, respondent amended his answer to include these commissions as income to petitioners for 1982. *205 Petitioner testified he would have reported the $ 8,181.05 if he had received a Form 1099 from Old Equity reflecting this amount. OPINION Assuming petitioner's argument to be true, this reason neither renders the income exempt from taxation nor justifies petitioner's failure to report the income. A taxpayer is simply not excused from reporting what is otherwise income, when the payor of such income fails to file the necessary information return on such income. Our tax system is a self-assessment system, and it is necessary for all taxpayers to keep adequate and accurate records of their income. Sutherland v. Commissioner,32 T.C. 862 (1959); section 6001. Under section 6001, a taxpayer is required to "keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary * * * prescribes." In addition, all persons, except farmers and wage earners, subject to tax under Subtitle A of the Code, "shall keep such permanent books of accounts or records, including inventories, as are sufficient to establish the amount of gross income * * * required to be shown by such person in any return of such tax or information. *206 " Section 1.6001-1, Income Tax Regs.
Accordingly, the $ 8,181.05 Old Equity commissions attributable to petitioner in 1982 were compensation for services under section 61(a)(1) and were includable in petitioners' 1982 gross income. Therefore, respondent's determination on this issue is sustained. However, since we determined earlier that the $ 1,636.21 deposited in the CFC escrow account was taxable and came from Old Equity, it follows that only the remaining 80% of $ 8,181.05, or $ 6,544.84, is taxable to petitioners.
ISSUE 4. Charitable Contributions.
FINDINGS OF FACT On Schedule A of their 1981 and 1982 returns, petitioners claimed the following charitable contributions: 1981
1982
Cash - $ 4,832.00
Cash - $ 160.50 Cash - 9,956.84 to Life, Inc.
Car -
1,000.00 to Life, Inc.
Car -
1,500.00 to Life, Inc.
Clothes -
50.00 to Years Profit for Profit
Bed -
50.00 to College Hill Elementary School
Total
$ 4,832.00
$ 12,717.34 The parties stipulated that petitioners were entitled to deductions for cash contributions of $ 299 and $ 88.50 for 1981 and 1982, respectively. [5] All other amounts *207 listed above remain in dispute. Life Foundation, Incorporated (Life, Inc.) was incorporated under Texas law in August 1979. On November 20, 1979, Life, Inc., applied for an exempt organization ruling under section 501(c)(3). In its application signed by petitioner, Life, Inc., identified the following as activities it planned to undertake: Goal 1: Prepare and publish in local newspapers articles of Biblical instruction and inspiration. Goal 2: Offer a Bible correspondence course through the newspaper and "yellow pages." Goal 3: Offer special Bible short courses and spiritual development courses. Goal 4: Provide direct mail evangelism (quarterly). Goal 5: Provide a telephone Bible Call -- short Bible-related topical, recorded messages for persons who call. Goal 6: prepare and broadcast weekly or daily radio Bible messages. Goal 7: Prepare and broadcast weekly or daily television Bible messages. Goal 8: Conduct *208 special public assemblies to teach the Bible and to worship God.
According to the application, funding for the foregoing activities was to be solicited from individuals at the close of published or broadcast Biblical presentations. Based on the above representations, respondent granted Life, Inc., a provisional ruling of exemption under section 501(c)(3), valid until September 1984. Petitioners maintained complete operational control of Life, Inc. Petitioner was the president, registered agent, an incorporator, and a director. Petitioner's wife, Meridon, was vice-president, an incorporator, and a director. Life, Inc., used petitioners' home as its address. Petitioner had signatory authority on Life, Inc.'s, bank account and made all disbursements from that account during the years in question. On December 27, 1984, subsequent to the end of its provisional ruling period, Life, Inc., submitted a financial statement to respondent. On this statement, Life, Inc., failed to disclose the beneficiaries of its funds. For instance, Life, Inc., stated that it paid scholarships to Brazos Christian School; however, petitioners acknowledged that their children were the only recipients *209 of the scholarships. Life, Inc., also failed to disclose it purchased a car for petitioner's father and paid his car insurance, or that it allowed petitioners to use the cars they allegedly donated to it. A further analysis of the disbursements from Life, Inc., establishes that the vast majority of the funds deposited were disbursed for petitioners' personal benefit, or for the benefit of their family members or friends. For example, Life, Inc., paid for X-rays for petitioners' son and for life insurance for petitioner's brother-in-law. In addition, Life, Inc., loaned $ 35,000 to petitioner in 1982. At trial, petitioner admitted that he, his family, and friends personally benefitted from the contributions made to Life, Inc. OPINION The Court first notes that the issuance by respondent of the 1979 exemption letter does not preclude respondent from challenging the claimed charitable contributions to Life, Inc. In Miedaner v. Commissioner,81 T.C. 272 (1983), the taxpayer established a church that received an exemption letter similar to the one issued to Life, Inc. This Court held that, where the church was operated in a manner materially different from that *210 represented in the exemption application, respondent was not estopped from disallowing the taxpayer's claimed charitable contribution deductions. Miedaner v. Commissioner, supra at 281-282. Here, Life, Inc.'s exemption application did not indicate that contributions to Life, Inc., would be disbursed primarily for petitioners' personal benefit, or for the benefit of their family members and friends. Accordingly, Life, Inc., was operated in a manner materially different from that represented in its application for tax exemption. Respondent is not estopped from disallowing the claimed charitable contributions deductions to Life, Inc. We note, as we did in Miedaner v. Commissioner, supra at 282, that petitioners were not an "unrelated third party [that] has relied on an exemption letter; rather, we are dealing with the founder of the [organization] himself." In Davis v. Commissioner,81 T.C. 806 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985), the taxpayer transferred funds from her personal checking account to a Universal Life Church checking account over which she had signatory authority. This *211 Court held that the taxpayer's signatory authority over the account allowed the taxpayer to retain dominion and control of the funds purportedly transferred and precluded a finding that there was a charitable contribution under section 170. Here, petitioners retained dominion and control of the cash and other property they purportedly contributed to Life, Inc. Further, a charitable contribution deduction is not allowed where net earnings of the purportedly exempt organization inure to the benefit of any individual. See section 170(c)(2)(C); Svedahl v. Commissioner,89 T.C. 245, 251 (1987), and cases cited therein. To record overwhelmingly establishes that the contributions to Life, Inc., inured to petitioners' benefit. The vast majority of funds contributed to Life, Inc., was disbursed for petitioners' personal benefit or for the benefit of their family members or friends. Petitioners failed to prove that any funds were used by Life, Inc., for a proper exempt purpose. With respect to the remaining "contributions" claimed for 1981 and 1982, on this record, we find that petitioners have not met their burden of proof. Accordingly, respondent's determination *212 on this issue is sustained.
ISSUE 5. Trade or Business Expenses.
FINDINGS OF FACT On Schedule C of their returns for 1980, 1981, and 1982, petitioners claimed deductions for expenses in the amounts of $ 10,142.50, $ 38,286.78, and $ 50,819.54, respectively. By stipulation, the parties reached agreement with respect to the majority of these expenses. However, several other expenses remain at issue. The amounts claimed on petitioners' returns, the amounts allowed by respondent, and the amounts at issue for 1980, 1981, and 1982, are as follows: 1980
Amount
Amount
Category of
Claimed
Allowed by
Amount at
Expense
on Return
Respondent
Issue
Office Supplies
$ 192.24
$ 270.00
$ 212.65
Prof. Entertainment
483.27
--  483.27
Prof. Expenses
746.06
--  746.06
Printing
597.39
--  597.39
Depreciation
706.39
--  706.39
Total               $ 2,725.35
* $ 270.00
* $ 2,745.76
*213 1981
Amount
Amount
Category of
Claimed
Allowed by
Amount at
Expense
on Return
Respondent
Issue
Office Supplies
and Postage  $ 2,017.76
$ 1,686.79
$ 438.49
Supplies
1,093,57
201.74
891.83
Travel & Entertainment
3,532.25
906.00
2,626.25
Prof. Lodging
470.54
190.46
280.08
Prof. Trips
2,835.64
362.19
2,473.45
Printing
1,016.87
--  1,062.04
Depreciation
703.51
--  703.51
Training
586.83
--  586.83
Prof. Entertainment
621.06
202.47
418.59
Total           $ 12,878.03
* $ 3,549.65
* $ 9,481.07
1982
Amount
Amount
Category of
Claimed
Allowed by
Amount at
Expense
on Return
Respondent
Issue
Prof. Training
$ 3,520.40
$ --  $ 3,520.40
Prof. Misc. Expenses
1,640.96
855.41
791.47
Printing
701.34
--  792.86
Depreciation
703.51
--  703.51
Wages
9,451.29
4,070.88
15,745.45
Prof. Entertainment
590.85
234.06
356.79
Total           $ 16,608.35
* $ 5,160.35
* $ 21,910.48
*214 OPINION Respondent's determinations are presumptively correct, and the burden of proof is on petitioners to establish otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 162 permits the deduction of all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on anny trade or business." Furthermore, section 274(d) provides that no deduction shall be allowed under section 162 for travel expenses (including expenses for meals and lodging while away from home) for for entertainment, unless the expenses are properly substantiated. The Court carefully reviewed the record, including numerous checks petitioners submitted into evidence to substantiate the amounts at issue. The Court is satisfied that petitioners did not adequately substantiate their claim to any amounts in excess of those allowed by respondent as shown above. Petitioner admittedly did not keep accurate records; in many *215 instances personal expenses were intermingled with his business expenses; in some instances, petitioner was reimbursed for certain expenses, and he admittedly did not keep accurate records of such reimbursements, nor were such reimbursements reported into income (to offset the claimed expense); those claimed expenses, which fell under the record-keeping requirements of section 274, were clearly not substantiated in accordance with the regulations of that section; in some instances, the expenses claimed were mislabeled or mischaracterized; and some of the canceled checks bore notations, which appeared to have been inscribed after the fact, while others bore no notation with and could not be correlated to the claimed expense. The Court notes that petitioner's difficulties here may well have been of his own making. Respondent issued the notice of deficiency without having audited petitioner's books and records, because petitioner refused to allow respondent's agents to conduct an audit or to even meet with respondent's counsel prior to trial. It was only at this Court's instruction to the parties (and to petitioner in particular) that the parties met in the context of preparing stipulations *216 for trial that respondent allowed some of the expenses as noted above and conceded other issues. Petitioners have failed to substantiate their entitlement to any additional expenses. Respondent, therefore, is sustained with respect to petitioners' Schedule C expenses for the years in question.
ISSUE 6. Additions to Tax.
FINDINGS OF FACT Respondent determined additions to tax under sections 6653(a)(1) and (2) for 1981 and 1982 and under section 6653(a) for 1980. In addition, respondent determined an addition to tax under section 6661(a) for 1982. [6]
OPINION The addition to tax under section 6653(a)(1) [7] applies if any part of an underpayment of tax is due to negligence of intentional disregard of rules or regulations. Section 6653(a)(2) applies only to that portion of an underpayment attributable to negligence or intentional disregard of rules or regulations. The burden of proof on this issue is on petitioner. Luman v. Commissioner,79 T.C. 846, 860-861 (1982); Bixby v. Commissioner,58 T.C. 757 (1972); Enoch v. Commissioner,57 T.C. 781, 802 (1972). *217 We are satisfied, from the record, that, with respect to section 6653(a)(1) for tax years 1981 and 1982, and section 6653(a) for the 1980 tax year, a portion of the underpayment of taxes for such years was attributable to negligence or intentional disregard of rules or regulations. For purposes of these additions only, we refer to the issue involving petitioners' trade or business expenses for each of the years in question. Without repeating our earlier discussion of this issue, we find that petitioners negligently or intentionally disregarded rules or regulations with respect to their trade or business expenses for each of the years in question. Without repeating our earlier discussion of this issue, we find that petitioners negligently or intentionally disregarded rules or regulations with respect to their trade or business expenses. Respondent, therefore, is sustained on the additions to tax under section 6653(a)(1) for 1981 and 1982, and under section 6653(a) for 1980. With respect to the addition to tax under section 6653(a)(2) for 1981 and 1982, the Court finds that the underpayment of taxes attributable to the $ 13,926.89 *218 petitioners claimed was excludable from their 1982 income was not due to negligence or intentional disregard of rules or regulations and, therefore, petitioners are sustained as to this addition. [8] In all other respects, however, the Court finds that the adjustments related to negligence or intentional disregard of rules or regulations and, therefore, the underpayment supports a finding that the addition to tax under section 6653(a)(2) should be sustained. Section 6661(a) provides that, in the event of a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of any underpayment attributable to such understatement. [9] Section 6661(b) provides that "a substantial understatement" exists if the amount of the understatement of income tax for the year exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $ 5,000. It is clear from the facts of this *219 case that a substantial understatement of income tax exists for the year 1982, because the understatement of tax (or deficiency here) exceeds the requirement of section 6661(b). We, therefore, sustain the addition to tax determined by respondent under section 6661(a). ISSUE 7. Section 6673 Damages.
FINDINGS OF FACT Respondent filed a motion for damages under section 6673. In August 1979, petitioners established a branch of the Universal Life Church known as the Universal Life Church, Inc. of College Station, Texas. In their petition, petitioners claimed their insurance commissions were not taxable for the reason that their commissions had been "assigned" to ULC, and that they *220 were only taxable on the "salary" paid them by ULC. Petitioners also made various "protester type" allegations, accusing respondent of intimidation, violations of their rights under the Privacy and Freedom of Information Acts, and requested $ 50,000 in damages. respondent cited this and other actions of petitioners as a basis for damages under section 6673. OPINION Section 6673 provides that, when it appears to the Court that proceedings before it have been instituted by the taxpayer primarily for delay, or that the taxpayer's position in the proceeding is frivolous or groundless, damages shall be awarded to the United States, not to exceed $ 5,000. This section of the Code was enacted to serve as a deterrent against wasteful and purposeless litigation of frivolous issues before this Court to delay the payment of taxes. Wilkinson v. Commissioner,71 T.C. 633 (1979). At trial, petitioners abandoned their position with respect to the ULC, their protester allegations, and the other claims alleged in their petition. Although their prior refusal to allow respondent to audit their books and records caused delays in the trial of this case, as well as inconveniences *221 to respondent and this Court, not to mention the frustration respondent undoubtedly experienced in dealing with an uncooperative taxpayer, the Court is nevertheless satisfied that what was ultimately presented for decision cannot, in all fairness, be characterized as frivolous or groundless, or that the proceeding itself was instituted primarily for purposes of delay. Respondent conceded or allowed certain adjustments; and other issues were submitted to the Court for decision. Under these circumstances, it is the Court's finding that damages are not warranted under section 6673, and respondent's motion is denied. See du Bois v. Commissioner,T.C. Memo. 1986-160. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
*. For 1980, this addition to tax is under section 6653(a). ** 50 percent of the interest due on $ 17,405.52. *** 50 percent of the interest due on $ 23,560.15. ↩
2. Petitioners conceded the addition to tax under section 6651(a) for 1980. ↩
3. As discussed earlier, the $ 1,636.21 Old Equity commissions, retained by CFC and deposited into the CFC Escrow Account, were compensation for services and were includable in petitioners' 1982 gross income. ↩
4. Respondent's position is in conflict as to the exact amount of the Old Equity Mutual Life Insurance Company (Old Equity) commissions earned by petitioner in 1982. On brief, respondent argues that the 20% retained by Creative Financial Concepts, Incorporated (CFC) was $ 1,636.21, and that the 80% portion paid to petitioners was $ 8,181.05. Thus, petitioners earned a total of $ 9,817.26 from Old Equity. In the stipulation of facts, the parties agreed that the 20% portion retained by CFC and deposited in the escrow account was $ 1,636.21, an amount which is precisely 20% of $ 8,181.05. Therefore, it is evident, and the Court finds, that the 80% portion paid to petitioners was $ 6,544.84 and not $ 8,181.05, as argued by respondent. ↩
5. Respondent allowed petitioners' contributions to: United Way, Moral Majority, Herald of Truth, Spina Bifida Association, Texas A & M Church of Christ, American Heart Association, March of Dimes, Elk Drug Fund, College Scholarship Services. ↩
*. The totals for the columns "Amounts Allowed by Respondent" and "Amount at Issue" for 1980, 1981, and 1982 exceed the amounts claimed on the returns for the reasons that petitioners claimed these additional amounts at trial. ↩
*. The totals for the columns "Amount Allowed by Respondent" and "Amount at Issue" for 1980, 1981, and 1982 exceed the amounts claimed on the returns for the reason that petitioners claimed these additional amounts at trial. ↩
*. The totals for the columns "Amounts Allowed by Respondent" and "Amount at Issue" for 1980, 1981, and 1982 exceed the amounts claimed on the returns for the reason that petitioners claimed these additional amounts at trial. ↩
6. At trial, petitioners conceded the addition to tax under section 6651(a) for 1980. ↩
7. Section 6653(a) for the 1980 tax year. ↩
8. The same claim petitioners made for the exclusion of $ 5,488 for 1981 also will not support a section 6653(a)(2) addition, because petitioners reported this amount on their return and merely claimed the exclusion at trial. ↩
9. The Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, section 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. Respondent amended his answer to seek an increase in the section 6661(a) addition to tax over the amount determined in the notice of deficiency. Pallottini v. Commissioner,↩ 90 T.C.    (March 30, 1988).